## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PACCAR INC,

     Plaintiff,

v.

     Case No. 8:25-cv-02282

     **Jury Trial Demanded**

DIRECT COMPONENTS, INC.,

     Defendant.

_____/

## <u>COMPLAINT</u>

PACCAR INC ("Plaintiff" and/or "PACCAR"), by and through its attorneys, Pisciotti Lallis Erdreich, files this Complaint against DIRECT COMPONENTS, INC. ("Defendant" and/or "DCI") and alleges as follows:

1.    This is an action for damages in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest or costs.

## <u>PARTIES</u>

2.    At all times material hereto, Plaintiff PACCAR was a Delaware corporation with a principal place of business in Bellevue, Washington.

3.    Upon information and belief, at all times material hereto, Defendant DCI was and is a Florida corporation with a principal place of business in Tampa, Florida.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction under 28 U.S.C § 1332(a)(3), because this action is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest or costs.

5.     This Court has personal jurisdiction over Defendant DCI, because, upon information and belief, DCI is a Florida corporation that is at "home" in Florida, conducts substantial business activities in and through Florida, and the alleged tortious conduct of DCI occurred in Florida.

6.     Venue is appropriate for this District under 28 U.S.C. § 1391(b)(3), because DCI's principal place of business is in Tampa, Florida; a substantial part of the acts or omissions giving rise to the claims in this Complaint occurred in this District, and the contractual terms governing the parties' transactions include consent to the exclusive jurisdiction of the state and federal courts in Hillsborough County.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

7.     PACCAR is a global technology leader in the design, manufacture and customer support of premium light-, medium- and heavy-duty trucks marketed under the Kenworth, Peterbilt and DAF nameplates.

8.     DCI is a broker and distributor of electronic components and parts including computer processing chips.

2

9.    PACCAR purchased various micro processing chips from DCI before July of 2022, and based on its communications with DCI, the documents exchanged by the parties, the contractual agreement entered into by the parties, and the course of dealings with DCI, PACCAR had a reasonable expectation of authenticity, legitimacy, quality and performance in the chips it purchased from DCI.

**POST COVID-19 MICROCHIP SHORTAGE**

10.    Post-COVID-19 pandemic, there was an extreme global shortage of microchips available on the open market.

11.    PACCAR's truck production was and is heavily dependent on available microchip stock as microchips are utilized in multiple truck components.

12.    Starting on or around June of 2022, the supply of multiple types of microchips became extremely scarce.

13.    Between approximately June and September of 2022, there were multiple instances where PACCAR's truck production line was in danger of shut down due to the lack of necessary microchips.

14.    To address this issue, PACCAR began having daily meetings with component suppliers such as Stoneridge Electronics.

15.    To help address the scarcity of microchips, PACCAR also began assisting its component part suppliers in locating and purchasing desperately needed microchips.

16.     Due to the inability of microchip suppliers to provide inventory, PACCAR was forced to go outside the normal supply channels to chip brokers, such as DCI, to try and find chips that seemingly were not otherwise available.

17.     Chip brokers, such as DCI, typically charge an extreme premium for the brokered chips they find.

**PACCAR'S ORDER OF 10,000 MCIMX6D4AVT08AER CHIPS**

18.     On or about July 6, 2022, Jay Lawley, Assistant Director of Purchasing for PACCAR, contacted Aaron Levinson, a Sourcing Team Leader for DCI, via email and inquired about the availability and pricing of i.MX 6 Dual-Core Processor Chips, part number MCIMX6D4AVT08AER (the "08AER Chips") for use in digital displays in certain PACCAR vehicles.

19.     Like with many other chips, PACCAR was experiencing an extreme shortage of the 08AER Chips threatening the continued operation of its truck assembly line.

20.     The 08AER Chips were specifically requested by Mr. Lawley due to the need for the performance requirements of the 08AER Chip in the digital displays.

21.     DCI was able to locate 25,000 08AER Chips that were otherwise absent from the market that PACCAR was led to believe by DCI were new, first quality, and authentic 08AER Chips.

22.     PACCAR learned through a later lawsuit with DCI that the 25,000

4

08AER Chips were obtained by a foreign supplier supposedly in Hong Kong, China called ICSAN.

23.     After numerous email exchanges, on or about July 8, 2022, Mr. Levison sent an email to Mr. Lawley with a price quote of $387.00 each for 25,000 08AER Chips.

24.     This predatory and excessively high price was more than ten (10) times higher than the normal and expected price for new, first quality, and authentic 08AER Chips.

25.     Due to the extreme chip shortage, PACCAR had no other option than to agree to the extreme price for the 10,000 08AER Chips ultimately purchased.

26.     The email providing the price quote from Mr. Levinson specifically identified the available chips as follows:

I was able to secure a price hold on the following parts:

MCIMX6D4AVT08AER
25,000 pieces @ $387.00 each
19+ Date Code

Estimated lead time with testing included (2-4 weeks).

*Pricing and availability are subject to change*

27.     It was represented by Mr. Levison that DCI had state-of-the-art chip testing facilities that could detect non-conforming, improper or counterfeit microchips.

28.    On or about July 10, 2022, Mr. Lawley informed Mr. Levinson that PACCAR had approved an order of 10,000 of the 08AER Chips, was assessing approval for more 08AER Chips, and would issue a purchase order for the initial 10,000 chip order.

29.    On or about July 11, 2022, PACCAR issued to DCI a signed Purchase Order,  PO NDS2219201, for the 10,000 08AER Chips at $387.00 per chip, for a total of $3,870,000.00. Purchase Order NDS2219201 expressly identified the 08AER Chips to be provided with part number MCIMX6D4AVT08AER. A true and correct copy of Purchase Order NDS2219201 is attached hereto as Exhibit A.

30.    On Monday, July 18, 2022, DCI sent a Sales Order, SO-80569, to Mr. Lawley via email referencing PACCAR's Purchase Order NDS2219201, for the order of 10,000 Chips at $387.00 per Chip, for a total of $3,870,000.00. Sales Order, SO-80569 expressly identified the chips to be provided in the Item and Description section as part number MCIMX6D4AVT08AER (the "10,000 08AER Chip Order"). A true and correct copy of Sales Order SO-80569 is attached hereto as Exhibit B.

31.    No separate terms of sale were ever provided to PACCAR by DCI, to PACCAR's knowledge, for any chip purchases.

32.    Mr. Lawley did not observe any reference to separate terms or conditions of sale in Sales Order SO-80569, nor was it his experience that any other chip brokers would include terms of sale with PACCAR's orders.

33.     Through a separate lawsuit involving DCI, PACCAR learned that the second page of Sales Order SO-80569 contained, in tiny non-distinct print, a reference to a separate DCI webpage that supposedly contained sales terms and conditions.

34.     However, no confirmed version of any website terms and conditions have ever been provided to PACCAR as it would have supposedly existed at the time that Sales Order SO-80569 was issued.

35.     At the time of issuance of Sales Order SO-80569, nor anytime closely thereafter including up to the delivery of the 10,000 08AER Chip Order, did Mr. Lawley realize that DCI had a separate website with supposed sale terms and/or that he was being directed to a separate website through Sales Order SO-80569.

36.     To PACCAR's knowledge, at no time did the communications from Mr. Levinson reference the need for PACCAR to go to a separate website for supposed sales terms.

37.     After various shipping delays, on or about August 15, 2022, PACCAR received the DCI testing report for the chips in the 10,000 08AER Chip Order. The Test Report indicated that the chips were first quality genuine MCIMX6D4AVT08AER chips that passed all performance and quality testing. A true and correct copy of DCI's Test Report for the 10,000 08AER Chip Order is attached hereto as Exhibit C.

38.    The Test Report from DCI included analysis and photographs specifically identifying the chips as MCIMX6D4AVT08AER chips:



39.    PACCAR relied on the Test Report as well as the prior representation from DCI that its testing and testing facilities could detect counterfeit or non-conforming chips.

40.    It was not until well after the delivery of the 10,000 08AER Chip Order that PACCAR learned through a separate lawsuit involving DCI that DCI did not actually test one of the 10,000 chips believed delivered to PACCAR but actually tested a "one-off" chip of unknown source or origination that was not part of the PACCAR order.

41.    In direct reliance on the Test Report and subsequent communications with DCI about the testing, on or about October 6, 2022, Mr. Lawley authorized the shipment of the 10,000 08AER Chip Order, which was directed to its digital screen supplier, Stoneridge Electronics.

42.     The 10,000 08AER Chip Order was shipped to Stoneridge Electronics and Invoice Number INV-101115 was issued to PACCAR on or about October 6, 2022. A true and correct copy of Invoice Number INV-101115 is attached hereto as Exhibit D.

43.     Invoice Number INV-101115 identified the chips provided as MCIMX6D4AVT08AER chips, and identified a ship date of August 12, 2022. However, the chips were not shipped until well after this date.

44.     The 10,000 08AER Chips were eventually received by Stoneridge Electronics were each marked with part number MCIMX6D4AVT08AER:



45.     In or about December of 2022, in direct reliance on the Test Report, PACCAR issued payment in full for the 10,000 08AER Chip Order.

46.     Throughout the entire purchase process for the 08AER Chips, DCI represented to PACCAR that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips.

47.     It was not until well after the delivery of the 10,000 08AER Chip Order

that PACCAR learned through a separate lawsuit involving DCI that DCI either did not have the capabilities to truly and properly determine if chips were counterfeit or intentionally or negligently failed to fully test chips including the 08AER Chips ordered by PACCAR.

## THE SIGNIFICANCE OF THE MCIMX6D4AVT08AER CHIP PART NUMBER

48.    The MCIMX6D4AVT08AER chip part number has significance for the details and performance of the chip.

49.    Each number or letter in the MCIMX6D4AVT08AER chip part number signifies specific performance characteristics of the chip.

50.    Of importance here, the letter "E" at the end of the chip number ("08A**E**R"), means that the chip is part of silicon revision 1.6 or revision "E."

51.    The prior revision of the chip, revision "D," has a silicon revision of 1.3 and is considered a lower performance and a less expensive processing chip.

52.    Due to its lesser performance characteristics, silicone revision 1.3, or revision "D," does not work in the Stoneridge Electronics digital displays for the PACCAR vehicles.

53.    The lesser performance characteristics of silicone revision 1.3, or revision "D," cannot be seen on a cursory inspection of the chips especially here where the chips were mismarked as  revision "E" instead of revision "D" on the face of the chip.

54.    The lesser performance characteristics of silicone revision 1.3, or revision "D," also cannot be detected by basic chip testing; it requires detailed and elaborate testing that was supposed to have been perforce on the chips by DCI.

**STONERIDGE'STESTING OF THE DCI PROVIDED CHIPS**

55.    In late June or early July of 2024, Stoneridge Electronics began testing the chips for use in its digital displays.

56.    Stoneridge Electronics found that the chips would not work in the displays and would not allow the displays to operate properly.

57.    On or about July 1, 2024, Stoneridge Electronics performed detailed testing of the 08AER Chips provided by DCI and found that the chips were displaying a silicone readout corresponding to silicon revision 1.3.

58.    The silicone readout corresponding to silicon revision 1.3 should have been part of DCI's testing of the chips and should have been detected by DCI had DCI completed the testing represented and promised.

59.    Based on the testing, it was determined that the 08AER Chips were revision "D" and were mismarked, or the markings were changed, to improperly reflect that the chips were silicon revision 1.6 or revision "E."

60.    Thus, testing revealed that the 08AER Chips sold to PACCAR by DCI were not what was ordered and/or contracted for by PACCAR and not what they were represented to be by DCI.

61.    Based on the testing, PACCAR paid DCI $3,870,000.00 for mismarked, misrepresented and non-conforming goods to PACCAR's financial detriment.

62.    DCI has an alleged history of providing fake, fraudulent and/or counterfeit microchips.

63.    To PACCAR's knowledge, DCI has been named as a defendant in at least three (3) other lawsuits where the sale of fake, fraudulent and/or counterfeit microchips by DCI has been alleged (*Sunpower Corp. v. DCI* (N.D. Cal. Case No. 5:23-cv-04599); *Kimball Electronics, LLC v. DCI* (S.D. Ind. Case No. 3:23-cv-00139); and *Toradex AG v. DCI* (M.D. Fla. Case No. 8:23-cv-00754)).

**PRIOR LAWSUIT INVOLVING PACCAR AND DCI**

64.    On August 16, 2023, DCI filed a lawsuit against PACCAR related to a separate dispute that arose about the 15,000 08AER Chips that were the balance of the 25,000 Chips obtained by DCI from ICSCAN.

65.    The lawsuit remains pending in the Middle District of Florida under case number 8:23-cv-01839-SDM-CPT ("15,000 Chip Lawsuit").

66.    Through pre-suit communications between PACCAR and DCI in the 15,000 Chip Lawsuit, and prior to the filing of this lawsuit, which included letters exchanged between February and May of 2023, DCI was put on notice that PACCAR believed the 25,000 microchips provided by DCI may be fake, counterfeit and/or

defective.

67.    Through such pre-suit communications PACCAR expressly reserved its rights related to potential claims, defenses, counterclaims, and/or remedies related to any and all of the 25,000 08AER Chips issued by DCI.

68.    The pre-suit communications placed DCI on notice of PACCAR's potential claims related to both the 15,000 and 10,000 chip orders.

69.    Through pre-suit communications, DCI was on notice of the possible claims by PACCAR about DCI's breach of contract, breach of warranty, and counterfeit and/or fake chips.

70.    In addition, through written discovery and depositions in the 15,000 Chip Lawsuit, and prior to the filing of this lawsuit, the issues of counterfeit and/or fake chips, including related to the 15,000 and 10,000 chip orders, were raised, which provided further notice to DCI.

71.    Specifically, issues related to possible counterfeit and/or fake chips were raised, and witnesses were questioned about counterfeit and/or fake chips, during the July 24, 2024 deposition of DCI's chief operating officer, chief financial officer and Rule 30(b)(6) corporate witness, Roddy Premsukh, and during the July 25, 2024 deposition of DCI's Sales Team Lead, Aaron Levinson.

72.    Further, written discovery provided by PACCAR in the 15,000 Chip Lawsuit, and prior to the filing of this lawsuit, directly addressed problems and

concerns with the scope and reliability of DCI's testing of the 10,000 chips and the possibility of counterfeit, fake or non-performing chips.

73.    In addition, in the 15,000 Chip Lawsuit, on or about October 14, 2024, PACCAR produced the report from GD4 and from Stoneridge employee Per Karlsson discussing the mismarked, counterfeit, fake and non-performing chips. The deposition of Mr. Karlsson was also conducted related to his mismarked, counterfeit, fake and non-performing chip opinions on March 13, 2025.

74.    Through discovery and depositions in the 15,000 Chip Lawsuit, and prior to the filing of this lawsuit, the mismarked, counterfeit, fake and non-performing chips has been a central point of discovery and DCI was placed on notice of PACCAR's issues with the 10,000 chips and PACCAR's possible claims related to the 10,000 chip order including claims related to the breach of contract and/or breach of warranty by PACCAR.

75.    To date, including in mediation related to the 15,000 Chip Lawsuit, DCI has refused to pay, return money paid or otherwise compensate PACCAR for the 10,000 Chips at issue in this lawsuit.

76.    In addition, in an abundance of caution, on July 17, 2025, PACCAR issued a formal notice of claim to DCI related to the mismarked, counterfeit, fake and non-performing chips and demanded reimbursement for the chips, reserving rights to seek all available damages.

77.    DCI never formally responded to this notice of claim, and in discussions with DCI's counsel, PACCAR was advised that DCI had no intention of resolving the issue at this juncture.

78.    Through this formal notice of claim, DCI was further placed on notice of the possible claims by PACCAR about DCI's breach of contract, breach of warranty, and counterfeit and/or fake chips.

79.    Based on the foregoing, PACCAR properly placed DCI on notice of its claims prior to instituting this action.

## COUNT I
## BREACH OF CONTRACT

80.    PACCAR repeats each and every allegation contained in paragraphs "1" through "79" of its Complaint as if more fully set forth herein at length and verbatim.

81.    PACCAR and DCI entered into an enforceable contractual agreement for 10,000 08AER Chips, part number MCIMX6D4AVT08AER, to be provided by DCI in exchange for the payment of $3,870,000.00.

82.    PACCAR performed all conditions, covenants and promises required of it in accordance with the terms of its contractual agreement with DCI, and as established through the course of dealings.

83.    PACCAR paid DCI $3,870,000.00 pursuant to the terms and/or requirements of its contractual agreement with DCI for 10,000 genuine, authentic

and first quality MCIMX6D4AVT08AER chips.

84.    As detailed above, DCI breached its contractual agreement with PACCAR by failing to provide genuine, authentic and first quality MCIMX6D4AVT08AER chips to PACCAR pursuant to the terms and/or requirements of its contractual agreement with PACCAR.

85.    PACCAR properly placed DCI on notice of its claims prior to instituting this action.

86.    As a direct and proximate result of Defendant DCI's breach of the aforesaid contractual agreement, Plaintiff PACCAR has suffered, and will continue to suffer, monetary damages in an amount in excess of $3,870,000.00 to be proven at trial, together with interest, attorneys' fees and costs of suit.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE  - VIOLATION OF FLA. STAT. §§ 672.314 AND 672.315

87.    PACCAR repeats each and every allegation contained in paragraphs "1" through "79" of its Complaint as if more fully set forth herein at length and verbatim.

88.    At all times mentioned herein, DCI commercially imported, sold and/or distributed electronic components including but not limited to electronic processing chips.

89.    As such, DCI is a "merchant" of the processing chips as defined under

Florida law.

90.    DCI as a merchant of such goods, sold the 08AER Chips to PACCAR.

91.    In selling the 08AER Chips to PACCAR, and through its communication with PACCAR, Sales Order, Test Report, Invoice, and course of dealings, DCI expressly and impliedly warranted to PACCAR that the chips were authentic, genuine, of quality, suitable for the ordinary and usual purposes for which the chips were intended, merchantable, and would function as intended.

92.    In selling the 08AER Chips to PACCAR, and through its communication with PACCAR, Sales Order, Test Report, Invoice, and course of dealings, DCI expressly and impliedly warranted to PACCAR that the chips were MCIMX6D4AVT08AER chips, and would conform to the label, packaging and/or markings for such chips which identified them as MCIMX6D4AVT08AER chips.

93.    Through its communication with PACCAR and course of dealings, DCI knew, or had reason to know, of PACCAR's intended and particular use, and purpose, of the 08AER Chips.

94.    DCI knew, or had reason to know, that PACCAR needed, and specifically requested, MCIMX6D4AVT08AER chips as such chips were required to operate the digital displays in which the chips were being installed.

95.    In purchasing the 08AER Chips for $3,870,000.00, PACCAR relied

upon the representations and warranties of DCI as to the nature, authenticity and quality of the chips to its detriment.

96.    The 08AER Chips sold by DCI to PACCAR were not genuine, authentic and first quality MCIMX6D4AVT08AER chips, were not as identified, represented and warranted by DCI, were unfit for their intended use, and were not of merchantable quality, as warranted by DCI.

97.    Since they were not genuine, authentic and first quality MCIMX6D4AVT08AER chips, the chips were of no practical use and value to PACCAR, all of which caused injury to PACCAR.

98.    DCI was on notice of the breach of implied warranties at the time the subject chips were imported, inspected by DCI, tested by DCI, and sold to PACCAR. DCI knew, or should have known, that the subject chips were not genuine, authentic and first quality MCIMX6D4AVT08AER chips, as required by PACCAR for use in its products.

99.    DCI has failed to legally, properly, efficiently, and conspicuously disclaim or limit any implied warranties under Florida law.

100.  DCI has also failed to provide an adequate remedy and caused its implied warranties to fail of their essential purpose, thereby permitting remedy under the implied warranties to PACCAR.

101.   PACCAR properly placed DCI on notice of its claims prior to instituting this action.

**COUNT III**
**BREACH OF EXPRESS WARRANTY - VIOLATION OF**
**FLA. STAT. § 672.313**

102.   PACCAR repeats each and every allegation contained in paragraphs "1" through "79" of its Complaint as if more fully set forth herein at length and verbatim.

103.   As detailed above, through its representatives, including but not limited to Mr. Levison, and its offers, emails, telephone calls, description of the goods, Sales Order, Testing Report, and Invoices, DCI expressly warranted that the goods were genuine, authentic and first quality MCIMX6D4AVT08AER chips, that the goods "conform to the description as set forth by Direct Components, Inc.," and that DCI would conduct full, proper and complete testing on the chips to confirm that they are not fake or counterfeit.

104.   The 08AER Chips sold by DCI to PACCAR were not genuine, authentic and first quality MCIMX6D4AVT08AER chips, and did not conform to the description of such goods as genuine, authentic and first quality MCIMX6D4AVT08AER in DCI's emails and telephone calls with PACCAR, and in DCI's Sales Order, Testing Report, and Invoices provided to PACCAR.

105.   The 08AER Chips sold by DCI to PACCAR were also not properly or

19

fully tested by DCI and/or testing was negligently or intentionally not fully competed DCI hide the real revision of the chips.

106.  Since the chips were not as identified, represented and warranted by DCI, and were not genuine, authentic and first quality MCIMX6D4AVT08AER chips, and were not fully or properly tested, they were of no practical use and value to PACCAR, all of which caused injury to PACCAR.

107.  DCI was on notice of the breach of its express warranties at the time the subject chips were imported, inspected by DCI, tested by DCI, and sold to PACCAR. DCI knew, or should have known, that the subject chips were not genuine, authentic and first quality MCIMX6D4AVT08AER chips, as required by PACCAR for use in its products.

108.  DCI has failed to legally, properly, efficiently, and conspicuously disclaim or limit any implied warranties under Florida law.

PACCAR properly placed DCI on notice of its claims prior to instituting this action.

**COUNT IV**
**VIOLATION OF THE FLORIDA DECEPTIVE & UNFAIR**
**TRADE PRACTICES ACT**

109.  PACCAR repeats each and every allegation contained in paragraphs "1" through "79" of Plaintiff's Complaint as if more fully set forth herein at length and verbatim.

110.  This cause of action is brought pursuant to the Florida Deceptive

and   Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* (the "Act" or "FDUTPA").  The stated purpose of the Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

111.   PACCAR is a "consumer" and the transaction at issue constitute "trade or commerce" as defined by Florida Statutes §§ 501.203(7) and (8), respectively.

112.   Florida Statute § 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

113.   In violation of the FDUTPA, DCI employed fraud, deception, false promises, misrepresentation and the knowing concealment of information, suppression, or omission of material facts in selling the 10,000 the 08AER Chips to PACCAR as set forth herein.

114.   The acts and/or omissions in violation of the FDUTPA by DCI occurred in Florida.

115.   More specifically, DCI engaged in fraud, deception, false promises, misrepresentation, concealment of information, suppression, or omission of material facts in violation of the FDUTPA in  the following ways:

- Failing to disclose and concealing that the chips were not genuine,

authentic and first quality MCIMX6D4AVT08AER chips.

- Misrepresenting or falsely representing that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips in its emails and telephone communication with PACCAR.

- Misrepresenting or falsely representing that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips in its Sales Order provided to PACCAR.

- Misrepresenting or falsely representing that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips in its Test Report provided to PACCAR.

- Failing to properly and fully test the chips to reveal their true revision as represented by DCI.

- Misrepresenting or falsely representing that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips in its Invoice provided to PACCAR.

- Providing chips that it knew were not genuine, authentic and first quality MCIMX6D4AVT08AER chips.

- Providing chips that it knew would not work in PACCAR's digital displays.

- Failing to take corrective or proper action once it learned and/or discovered that the chips were not genuine, authentic and first quality MCIMX6D4AVT08AER chips as ordered by PACCAR.

116. DCI engaged in the concealment, suppression, or omission of the aforementioned material facts with the intent that PACCAR would rely upon the concealment, suppression, or omission of such material facts.

117. These misrepresentations, deceptive practices, and omissions of material facts affected PACCAR's decisions and conduct, as a member of the consuming public, regarding the purchase of the subject chips.

118. DCI knew that the chips it was offering, and which it sold, to PACCAR were not genuine, authentic and first quality MCIMX6D4AVT08AER chips and that it was concealing or withholding this fact from PACCAR.

119. The 10,000 chips provided to PACCAR by DCI were mismarked and/or the markings were changed to conceal that the chips were not genuine and authentic MCIMX6D4AVT08AER chips.

120. DCI concealed the true nature of the chips in its testing and Test Report which identified the chips, in relevant part, as genuine, authentic and first quality MCIMX6D4AVT08AER chips.

121. DCI also knew that PACCAR needed and had requested genuine, authentic and first quality MCIMX6D4AVT08AER chips.

122. DCI intended PACCAR to rely on its concealment of the true nature of the chips.

123. PACCAR reasonably relied on DCI's false promises and misrepresentation as to the nature and authenticity of the 10,000 chips.

124. PACCAR entered into an agreement and paid DCI $3,870,000.00 in direct reliance on the concealed fact as to the nature and authenticity of the 10,000 chips.

125. As detailed above, the 10,000 chips were not genuine, authentic and first quality MCIMX6D4AVT08AER chips, and cannot be used by PACCAR for their intended purpose.

126. DCI's concealment, suppression, or omission of material facts as alleged herein constitutes unfair, deceptive and fraudulent business practices within the meaning of FDUTPA.

127. As a direct and proximate cause of the violation of FDUTPA, described herein, PACCAR has been injured by the purchase of chips that it cannot use in its digital displays because they are not genuine, authentic and first quality MCIMX6D4AVT08AER chips.

128. DCI's unlawful conduct is continuing, with no indication that DCI's unlawful conduct will cease.

129. DCI's actions herein were willful and intentional, and evidences a lack

of good faith, honesty in fact, and observance of fair dealing so as to constitute unconscionable commercial practices in violation of FDUTPA, Fla. Stats. § 501.201, *et seq*.

130.   Said acts and practices on the part of DCI were and are illegal and unlawful pursuant to Florida Statute § 501.204.

131.   As a direct and proximate result of DCI's violations of FDUTPA, PACCAR has suffered damages and is entitled to economic, equitable and declaratory relief, damages allowed under FDUTPA, costs, and statutory attorney fees and all other relief permitted under FDUTPA, Fla. Stats. § 501.201, *et seq.*

**COUNT V**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH**
**AND FAIR DEALING**

132.   PACCAR repeats each and every allegation contained in paragraphs "1" through "79" of Plaintiff's Complaint as if more fully set forth herein at length and verbatim.

133.   PACCAR has performed all conditions, covenants and promises required to be performed by it in accordance with the terms of its contractual agreements with DCI.

134.   DCI has breached the covenant of good faith and fair dealing implied in the contractual agreements with PACCAR by misrepresenting the true nature and quality of the 10,000 08AER Chips it sold to PACCAR by, among other things:

25

- Failing to disclose and concealing that the chips were not genuine, authentic and first quality MCIMX6D4AVT08AER chips.

- Misrepresenting or falsely representing that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips in its emails and telephone communication with PACCAR.

- Misrepresenting or falsely representing that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips in its Sales Order provided to PACCAR.

- Misrepresenting or falsely representing that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips in its Test Report provided to PACCAR.

- Failing to properly and fully test the chips to reveal their true revision as represented by DCI

- Misrepresenting or falsely representing that the chips were genuine, authentic and first quality MCIMX6D4AVT08AER chips in its Invoice provided to PACCAR.

- Providing chips that it knew were not genuine, authentic and first quality MCIMX6D4AVT08AER chips.

- Providing chips that it knew would not work in PACCAR's digital displays.

- Failing to take corrective or proper action once it learned and/or discovered that the chips were not genuine, authentic and first quality MCIMX6D4AVT08AER chips as ordered by PACCAR.

135.   The actions and omissions of DCI adversely impacted PACCAR's expected benefits of its contractual agreement with DCI.

136.   The actions and omissions of DCI are inconsistent with PACCAR's expectations when entering into the contractual agreement with DCI, and the reasonable expectations under the contractual agreement with DCI.

137.   As a direct and proximate result of DCI's actions and omissions, PACCAR has suffered, and will continue to suffer, monetary damages in an amount in excess of $3,870,000.00 to be proven at trial, together with interest, attorneys' fees and costs of suit.

## COUNT VI
## UNJUST ENRICHMENT

138.   PACCAR repeats each and every allegation contained in paragraphs "1" through "79" of Plaintiff's Complaint as if more fully set forth herein at length and verbatim.

139.   Pleading in the alternative, in the event a valid and enforceable contract is not found to exist, and/or conditions precedent to bringing a breach of contract claim are not found to have been met, and as a result of the conduct described above, DCI has been, and will continue to be, unjustly enriched at the expense of PACCAR.

27

140.    Specifically, DCI has been unjustly enriched by its improper, wrongful and/or unlawful actions of selling and providing a product to PACCAR that was not what it was promised and/or purported to be, by failing to disclose the proper nature and performance characteristics of the chips actually being sold to PACCAR, by misrepresenting the actual nature and performance characteristics of the chips being sold to PACCAR, by failing to properly and fully test the chips as represented by DCI, and/or by selling to PACCAR and inferior processing chip that was improperly mismarked and misidentified as a different and higher quality chip.

141.    PACCAR would not have purchased the 10,000 chips from DCI if the true nature and performance characteristics of the chip were not hidden and/or misrepresented by DCI, and/or were disclosed by DCI to PACCAR.

142.    As a direct and proximate result of Defendant DCI's unjust enrichment, Plaintiff PACCAR seeks judgment in its favor to disgorge this unjust enrichment in accordance with the laws of the State of Florida, together with interest, attorneys' fees and costs of suit.

## COUNT VII
## PROMISSORY ESTOPPEL

143.    PACCAR repeats each and every allegation contained in paragraphs "1" through "79" of Plaintiff's Complaint as if more fully set forth herein at length and verbatim.

144.    Pleading in the alternative, in the event a valid and enforceable contract

is not found to exist, PACCAR is entitled to a judgment due to its detrimental reliance on the false promises made by DCI.

145. Through its representatives, including but not limited to Mr. Levison, DCI represented and promised to PACCAR that the 10,000 chips being sold were genuine, authentic and first quality MCIMX6D4AVT08AER chips that had been properly and fully tested by DCI.

146. The representations and promises by DCI as to the nature and authenticity of the 10,000 chips were a material misrepresentation by DCI.

147. PACCAR reasonably relied on DCI's promises and representation as to the nature and authenticity of the 10,000 chips.

148. PACCAR paid DCI $3,870,000.00 in direct reliance on the promises and representation as to the nature and authenticity of the 10,000 chips.

149. As detailed above, the 10,000 chips were not genuine, authentic and first quality MCIMX6D4AVT08AER chips, and cannot be used by PACCAR for their intended purpose.

150. Due to the misrepresentations and/or false promises about the nature of the 10,000 chips, they are of no practical value to PACCAR.

151. Thus, PACCAR has suffered losses and damages acting in direct reliance on DCI's misrepresentation and/or false promise about the nature of the 10,000 chips.

152.   PACCAR is entitled to damages and all other available remedies at law and equity for its payment of $3,870,000.00 in direct reliance on DCI's misrepresentations and/or false promises about the nature of the 10,000 chips.

**WHEREFORE,** Plaintiff PACCAR prays for a judgment in its favor and against Defendant DCI for an award for all compensatory damages, in excess of $3,870,000.00, in an amount to be determined at trial, together with interest, attorneys' fees, punitive damages, costs of suit and disbursements of this action, and any such further relief this court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues appropriate for the jury to consider.

Dated: August 26, 2025

Respectfully submitted,

By: *s/Ryan L. Erdreich*
Ryan L. Erdreich, Esq.
Florida Bar No.:  65712
PISCIOTTI LALLIS ERDREICH
2054 Vista Parkway, Suite 400
West Palm Beach, FL 33411
Telephone: (973) 245-8100
Facsimile: (973) 245-8101
rerdreich@pisciotti.com

ATTORNEYS FOR PLAINTIFF PACCAR INC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 26th day of August 2025, I caused the foregoing to be electronically filed with the Clerk of the Court and served on any/all counsel for all parties via the Court's Electronic Case Filing System.

Dated: August 26, 2025

*s/Ryan L. Erdreich*
Ryan L. Erdreich, Esq.
Florida Bar No.:  65712
