UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PACCAR INC,

Plaintiff,

v. Case No: 8:25-cv-02282-JLB-LSG

DIRECT COMPONENTS, INC.,

Defendant.

_______________________________________/

**ORDER**

PACCAR INC brings this action against Direct Components, Inc., alleging (1) a breach of contract ("Count I"), (2) a breach of the implied warranty of merchantability and fitness for a particular purpose ("Count II"), (3) a breach of express warranty ("Count III"), (4) a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") ("Count IV"), (5) a breach of the implied covenant of good faith and fair dealing ("Count V"), (6) unjust enrichment ("Count VI"), and (7) promissory estoppel ("Count VII"). (Doc. 1). Defendant filed a Motion to Dismiss the Complaint. (Doc. 21). Plaintiff responded in opposition. (Doc. 24). Upon careful review of the Complaint, the parties' briefing, and the record, the Court finds that Defendant's Motion to Dismiss is due to be **GRANTED in part and DENIED in part.**

## BACKGROUND[1]

PACCAR designs and manufactures light-duty, medium-duty, and heavy-duty trucks. (Doc. 1 at ¶ 7). PACCAR's trucks use microchips. (*Id.* at ¶ 11). In June 2022, the supply of the microchips used by PACCAR trucks became "extremely scarce." (*Id.* at ¶ 12). Attempting to find microchips during the microchip shortage, PACCAR contacted Direct Components ("DCI"), a microchip broker, and asked "about the availability and pricing of i.MX 6 Dual-Core Processor Chips, part number MCIMX6D4AVT08AER." (*Id.* at ¶ 18). After locating 25,000 chips with a matching part number, DCI sent to PACCAR a quote of $387.00 per chip. (*Id.* at ¶¶ 21, 23).

DCI told PACCAR that it "had state-of-the-art chip testing facilities that could detect non-conforming, improper or counterfeit microchips." (*Id.* at ¶ 27). Also, DCI told PACCAR that the chips "were new, first quality, and authentic." (*Id.* at ¶ 21). PACCAR approved the purchase of 10,000 chips at $387.00 per chip and signed and sent to DCI a purchase order specifying that each chip must bear part number MCIMX6D4AVT08AER and perform accordingly. (*Id.* at ¶¶ 28–29). A few days later, DCI sent PACCAR a "sales order" specifying that each chip must bear part number MCIMX6D4AVT08AER and perform accordingly. (*Id.* at ¶ 30).

---

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). Accordingly, this background section relies on the facts recited in the Complaint. (*See* Doc. 1).

Plaintiff's Assistant Director of Purchasing, Jay Lawley, "did not observe any reference to separate terms or conditions of sale in Sales Order SO-80569, nor was it his experience that any other chip brokers would include terms of sale with PACCAR's orders." (*See id.* at ¶¶ 18, 32). To Plaintiff's knowledge, Defendant never provided it with separate terms of sale. (*Id.* at ¶ 31). While Plaintiff admits that in a separate lawsuit it learned much later that "the second page of Sales Order SO-80569 contained, in tiny non-distinct print, a reference to a separate DCI webpage that supposedly contained sales terms and conditions," Mr. Lawley did not realize at or about the time of the Sales Order that Defendant "had a separate website with supposed sale terms . . . that he was being directed to." (*See id.* at ¶¶ 33, 35). "To PACCAR's knowledge, at no time did the communications from [Defendant's Sourcing Team Leader] reference the need for PACCAR to go to a separate website for supposed sales terms." (*Id.* at ¶ 36). "[N]o confirmed version of any website terms and conditions ha[s] ever been provided to PACCAR as it would have supposedly existed at the time that Sales Order SO-80569 was issued." (*Id.* at ¶ 34).

Before shipping the microchips, DCI sent PACCAR a testing report, which affirmed "that the chips were first quality genuine MCIMX6D4AVT08AER chips" that passed all performance and quality testing and included photos "identifying the chips as MCIMX6D4AVT08AER." (*Id.* at ¶¶ 37–38). Because the testing confirmed the validity of the microchips, PACCAR "authorized the shipment" of the order. (*Id.* at ¶¶ 39, 41).

On or about October 6, 2022, Stoneridge Electronics, PACCAR's digital screen supplier, received the 10,000 microchips, each bearing part number MCIMX6D4AVT08AER. (*Id.* at ¶¶ 41–42, 44). PACCAR received and paid the invoice, which again confirmed that the delivered microchips bore part number MCIMX6D4AVT08AER and performed accordingly. (*Id.* at ¶¶ 42–43, 45).

In June or July 2024, nearly two years after receiving the microchips, Stoneridge "began testing the chips." (*Id.* at ¶ 55). Testing revealed that the microchips performed unsatisfactorily in Stoneridge's "digital displays." (*Id.* at ¶¶ 55–56). Further "detailed testing" revealed "that the chips were displaying a silicone readout corresponding to silicon revision 1.3." (*Id.* at ¶ 57). A MCIMX6D4AVT08AER microchip has a "silicon revision" of 1.6. (*See id.* at ¶¶ 49–50). A microchip's "silicon revision" denotes the microchip's "performance characteristics;" "silicon revision 1.3" "is considered a lower performance and a less expensive processing chip" compared to "silicon revision 1.6." (*Id.* at ¶¶ 49–52). After reviewing the testing results, PACCAR determined that it paid DCI "$3,870,000.00 for mismarked, misrepresented and non-conforming goods." (*Id.* at ¶ 61).

"On August 16, 2023, DCI filed a lawsuit against PACCAR related to a separate dispute that arose about the 15,000 08AER Chips that were the balance of

the 25,000 Chips obtained by DCI."[2] (*See id.* at ¶¶ 21, 64–65); *see generally Direct Components, Inc. v. PACCAR Inc.*, No. 8:23-cv-01839-SDM-CPT (M.D. Fla.). Plaintiff states that during the July 24, 2024, "deposition of DCI's chief operating officer, chief financial officer and Rule 30(b)(6) corporate witness" and during the July 25, 2024, "deposition of DCI's Sales Team Lead," issues related to possible counterfeit or fake chips were raised, and the witnesses were questioned about counterfeit or fake chips. (Doc. 1 at ¶ 71). Plaintiff further states that the written discovery it provided in the 15,000 Chip lawsuit prior to the filing of this lawsuit directly addressed problems and concerns with the scope and reliability of Defendant's testing of the 10,000 chips and the possibility of counterfeit, fake, or non-performing chips. (*Id.* at ¶ 72). Additionally, on or about October 14, 2024, in discovery for the 15,000 Chip lawsuit, Plaintiff produced a report from an employee of Stoneridge Electronics that discussed the mismarked, counterfeit, fake and non-performing chips. (*Id.* at ¶ 73). Plaintiff notes that the deposition of that employee on March 13, 2025, also related to his opinions on mismarked, counterfeit, fake, and non-performing chips. (*Id.*).

"[I]n an abundance of caution, on July 17, 2025," before filing the present lawsuit on August 26, 2025, Plaintiff "issued a formal notice of claim to DCI related

---

[2] The Court takes judicial notice of the separate, ongoing 15,000 chips action ("15,000 Chip lawsuit") brought by Defendant against Plaintiff. The Court may take judicial notice of public records, such as other dockets, because such documents are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.1999) (quoting Fed. R. Evid. 201(b)(2)).

to the . . . counterfeit . . . chips and demanded reimbursement for the chips, reserving rights to seek all available damages." (*Id.* at ¶ 76).

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). This plausibility standard is met when the plaintiff pleads enough factual content "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When reviewing a motion to dismiss, courts must accept all factual allegations in a complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). Legal conclusions, however, "are not entitled to the assumption of truth." *Ashcroft*, 556 U.S. at 679. "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

## DISCUSSION

### I. Florida's statutory pre-suit notice requirement requires dismissal of the four contract claims alleged in Counts I, II, III, and V.

Plaintiff alleges four Counts anchored in its contract with Defendant: (1) breach of contract, (2) breach of the implied warranty of merchantability and fitness for a particular purpose, (3) breach of express warranty, and (4) breach of the

implied covenant of good faith and fair dealing—Counts I, II, III, and V, respectively.

Under Florida Statute § 672.607(3)(a), a buyer "must *within a reasonable time* after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *Id.* (emphasis added). A complaint that fails to allege proper notice under section 672.607(3)(a) fails to state a claim. *See Dunham-Bush, Inc. v. Thermo-Air Serv., Inc.*, 351 So. 2d 351, 353 (Fla. 4th DCA 1977). "[T]he burden is on the plaintiff to show that he gave the required notice within a reasonable time." *Gen. Matters, Inc. v. Paramount Canning Co.*, 382 So. 2d 1262, 1264 (Fla. 2d DCA 1980).

The notice must be both timely and sufficient under the circumstances and is governed by the buyer's obligation to act in good faith. *Royal Typewriter Co., a Div. of Litton Bus. Sys., Inc. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1102 (11th Cir. 1983) (citing *E. Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 977 (5th Cir. 1976)). It is not enough "that a seller has knowledge of the facts constituting a nonconforming tender; he must also be informed that the buyer considers him to be in breach of the contract." *E. Air Lines*, 532 F.2d at 973. Not every expression of discontent by the buyer always satisfies the notice requirement. *Id.* at 976–77.

"The buyer's conduct, then, taken as a whole, must constitute timely notification that the transaction is claimed to involve a breach." *Id.* at 978. In other words, the notice must "be such as informs the seller that the transaction is

claimed to involve a breach, and thus opens the way for normal settlement through negotiation." *Id.* at 976 (internal quotation marks omitted). The statutory pre-suit notice requires "that a seller be reasonably protected against stale claims arising out of transactions which a buyer has led him to believe were closed." *Id.* at 972. "Early warning permits the seller to investigate the claim while the facts are fresh, avoid the defect in the future, minimize his damages, or perhaps assert a timely claim of his own against third parties." *Id.*

Here, Plaintiff did not give notice of the breach within a reasonable time after discovering it. On or about October 6, 2022, Defendant shipped the 10,000 08AER Chip Order to Plaintiff's supplier, Stoneridge Electronics. (Doc. 1 at ¶ 42). And Plaintiff paid the invoice in full for that 10,000 08AER Chip Order in or about December 2022. (*Id.* at ¶ 45). On or about July 1, 2024, nearly two years later, PACCAR's supplier performed testing of the chips and found that they were of lower quality. (*Id.* at ¶¶ 57, 59). Plaintiff then filed a lawsuit against Defendant on August 13, 2024—after Defendant had filed the 15,000 Chip lawsuit against Plaintiff on August 16, 2023—alleging substantially the same claims as the present lawsuit.[3] *See PACCAR Inc. v. Direct Components, Inc.*, No. 8:24-cv-01910-SDM-NHA (M.D. Fla.); *Direct Components, Inc. v. PACCAR Inc.*, No. 8:23-cv-01839-SDM-

---

[3] In addition to the 15,000 Chip lawsuit, the Court takes judicial notice of the prior 10,000 chips action ("Prior 10,000 Chip lawsuit") brought by Plaintiff alleging substantially the same claims against Defendant. The Court may take judicial notice of public records, such as other dockets, because such documents are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (quoting Fed. R. Evid. 201(b)(2)).

CPT (M.D. Fla.). Nearly a year later, Plaintiff voluntarily dismissed that lawsuit after the district court had dismissed it without prejudice on pre-suit notice grounds. *See* Order granting in part Motion to Dismiss (Doc. 46), *PACCAR Inc. v. Direct Components, Inc.*, No. 8:24-cv-01910-SDM-NHA (M.D. Fla. June 23, 2025); Notice of Voluntary Dismissal (Doc. 48), *PACCAR Inc. v. Direct Components, Inc.*, No. 8:24-cv-01910-SDM-NHA (M.D. Fla. July 15, 2025). Two days after Plaintiff's voluntary dismissal of that suit, on July 17, 2025, Plaintiff finally sent a "formal notice of claim" to Defendant. (Doc. 1 at ¶ 76).

In its opposition to Defendant's Motion to Dismiss, Plaintiff states that "after discovering that the chips were inappropriate in July 2024 when Stoneridge went to use them, [Plaintiff] consistently and repeatedly informed DCI about the non-conforming chips and requested reimbursement for the costs of the chips." (Doc. 24 at 14). However, Plaintiff not only fails to allege notice within a reasonable time of when it discovered any breach but also fails to allege that any supposed notice "inform[ed] . . . [Defendant] that the transaction is claimed to involve a breach, and thus open[ed] the way for normal settlement through negotiation."
*See Eastern Air Lines*, 532 F.2d at 976.

Plaintiff alleges that through the discovery in the 15,000 Chip lawsuit, the counterfeit chips have been a central point of discovery, and Defendant was consequently placed on notice of Plaintiff's issues with the chips and Plaintiff's *possible* claims related to the chip order. (Doc. 1 at ¶ 74); *see generally Direct Components, Inc. v. PACCAR Inc.*, No. 8:23-cv-01839-SDM-CPT (M.D. Fla.).

Specifically, Plaintiff alleges that through written discovery and depositions, Defendant received notice on the issues of counterfeit and/or fake chips. (Doc. 1 at ¶ 70).

Plaintiff states that "during the July 24, 2024 deposition of DCI's chief operating officer, chief financial officer and Rule 30(b)(6) corporate witness . . . and during the July 25, 2024 deposition of DCI's Sales Team Lead," issues related to *possible* counterfeit or fake chips were raised and the witnesses were questioned about counterfeit or fake chips. (*Id.* at ¶ 71) (emphasis added). Plaintiff further states that the written discovery it provided to Defendant in the 15,000 Chip lawsuit prior to the filing of this lawsuit directly addressed problems and concerns with the scope and reliability of Defendant's testing of the 10,000 chips and the *possibility* of counterfeit, fake, or non-performing chips. (*Id.* at ¶ 72) (emphasis added). Additionally, on or about October 14, 2024, Plaintiff produced in the discovery for the 15,000 Chip lawsuit a report from an employee of Plaintiff's supplier that discussed the mismarked, counterfeit, fake, and non-performing chips. (Doc. 1 at ¶ 73). Plaintiff notes that the deposition of that employee on March 13, 2025, also related to his opinions on mismarked, counterfeit, fake, and non-performing chips. (*Id.*).

But raising issues regarding *possible* counterfeit chips generally in discovery for the separate 15,000 Chip lawsuit does not inform Defendant that the 10,000-chip transaction specifically is claimed by Plaintiff to involve a breach. The purpose of the notice requirement is to allow Defendant to "investigate the claim while the

facts are fresh . . . [and] minimize [its] damages," and to "open the way for settlement through negotiation between the parties," which these generic discovery references to possible counterfeit chips with nothing more do not accomplish. *See E. Air Lines*, 532 F.2d at 972.

Notably, before Plaintiff voluntarily dismissed its Prior 10,000 Chip lawsuit against Defendant with substantially the same claims raised here, the court in that case had dismissed the contract claims there because Plaintiff had not alleged pre-suit notice of breach to Defendant before bringing that lawsuit. *See* Order granting in part Motion to Dismiss (Doc. 46), *PACCAR Inc. v. Direct Components, Inc.*, No. 8:24-cv-01910-SDM-NHA (M.D. Fla. June 23, 2025). Plaintiff then voluntarily dismissed that lawsuit and "in an abundance of caution, on July 17, 2025," before filing the present lawsuit on August 26, 2025, "issued a formal notice of claim to DCI related to the . . . counterfeit . . . chips and demanded reimbursement for the chips, reserving rights to seek all available damages." (Doc. 1 at ¶ 76); *see* Notice of Voluntary Dismissal (Doc. 48), *PACCAR Inc. v. Direct Components, Inc.*, No. 8:24-cv-01910-SDM-NHA (M.D. Fla. July 15, 2025). Plaintiff's conduct on the whole does not "constitute timely notification that the transaction is claimed to involve a breach." *See E. Air Lines*, 532 F.2d at 978.

Thus, Plaintiff cannot show that it gave the required section 672.607(3)(a) pre-suit notice of the alleged breach to Defendant. *See* Fla. Stat. § 672.607(3)(a). Therefore, Plaintiff's contract claims in Counts I, II, III and V are dismissed with prejudice for its failure to timely provide Defendant pre-suit notice.

**II. Plaintiff's FDUTPA Tort Claim in Count IV survives.**

Defendant seeks to dismiss Count IV of Plaintiff's Complaint (Doc. 1 at 20–25) under Florida's independent tort doctrine. (Doc. 21 at 16–17). This Court disagrees.

Plaintiff's FDUTPA claim alleges that DCI provided fraudulent test results that were purported to verify the quality of the microchips, lied to PACCAR about DCI's ability to procure the quality of chips required, and enticed PACCAR to agree to obtain the chips. (Doc. 1 at 21–23). Under the independent tort doctrine, a plaintiff must allege a tort that is "distinguishable from or independent of [the] breach of contract" to bring a valid claim in tort based on a breach in a contractual relationship. *Lewis v. Guthartz*, 428 So. 2d 222, 224 (Fla. 1982). But Florida courts have consistently held that an FDUTPA claim is a distinct statutory claim and not subject to judicially created rules such as the independent tort doctrine and economic loss rule. *See Comptech Int'l, Inc. v. Milam Commerce Park, Ltd.*, 753 So.2d 1219, 1222–23 (Fla. 1999) (holding that the economic loss rule does not bar statutory causes of action, particularly when the statutory language providing the cause of action makes clear the statutory remedy is in addition to other available remedies); *Sarkis v. Pafford Oil Co., Inc.*, 697 So. 2d 524, 528 (Fla. 1st DCA 1997) (citing *Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.,* 693 So. 2d 602, 609, 611 (Fla. 2d DCA 1997) (holding that the judicial policy pronouncement embodied in the economic loss rule has no application to a statutory action brought under the FDUTPA, "courts do not have the right to limit and, in essence, to abrogate, . . . the

expanded remedies granted to consumers under this legislatively created scheme by allowing the judicially favored economic loss rule to override a legislative policy pronouncement and to eliminate the enforcement of those remedies")); *cf. Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 896 So. 2d 773, 777 (Fla. 1st DCA 2004), *decision quashed*, 950 So. 2d 380 (Fla. 2007) ("[A]s a separation of powers matter, a judicially created policy . . . must not be used to limit the application of a legislatively created, statutory cause of action.").

Therefore, taking all allegations in the complaint as true, as this Court must at this stage of the proceedings, Defendant's motion to dismiss Count IV is denied.

**III. Defendant's Motion to Dismiss is denied as to Counts VI and VII.**

Plaintiff also sues Defendant, in the alternative, for unjust enrichment (Count VI) and promissory estoppel (Count VII). (Doc. 1 at 25–30). "The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Shands Teaching Hosp. & Clinics, Inc. v. Beech Street Corp.,* 899 So. 2d 1222, 1227 (Fla. 1st DCA 2005) (quoting *Hillman Constr. Corp. v. Wainer,* 636 So. 2d 576, 577 (Fla. 4th DCA 1994)). For promissory estoppel, a plaintiff must allege: (1) that the defendant made a promise that the defendant should have reasonably expected to induce action or forbearance on the part of the plaintiff; (2) that the promise did induce such action or forbearance; and (3) that injustice can

only be avoided by enforcement of the promise. *See W.R. Grace & Co. v. Geodata Services, Inc.,* 547 So. 2d 919, 924 (Fla. 1989).

"Under Florida law, a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment." *Real Estate Value Co., Inc. v. Carnival Corp.*, 92 So. 3d 255, 263 n.2 (Fla. 3d DCA 2012) (citing *Hazen v. Cobb,* 117 So. 853, 857–58 (Fla. 1928)). "It is only upon a showing that an express contract exists that the unjust enrichment or promissory estoppel count fails." *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. 5th DCA 1998). "Until an express contract is proven, a motion to dismiss a claim for promissory estoppel or unjust enrichment . . . is premature." *Id.*

Here, Defendant points to a purported document specifying "Terms and Conditions." Specifically, Defendant asserts that this document contains an exculpatory clause that protects it from liability on all claims and, alternatively, a damages limitation clause that precludes any claims for damages exceeding the purchase price or claims for indirect, special, incidental, consequential, or punitive damages. (Doc. 21 at 18–19). Plaintiff responds in opposition that Plaintiff never received or saw the "Terms and Conditions" document and disputes its authenticity and therefore whether it is incorporated into the microchip transaction. (Doc. 24 at 15–16). Taking all the facts in the complaint as true, as the Court must do at this stage of the proceedings, it would be inappropriate for the Court to dismiss these claims on the facts presented.

"[A] document central to the complaint that the defense appends to its motion to dismiss is also properly considered, *provided that its contents are not in dispute*." *Harris v. Ivax Corp.,* 182 F.3d 799, 802 n.2 (11th Cir. 1999) (emphasis added). In other words, for it to be properly considered at the motion to dismiss stage, a document attached to a motion to dismiss must be (1) central to the plaintiff's claim and (2) *undisputed*. *See id.*

Here, Plaintiff alleges that on or about July 11, 2022, it issued to Defendant "a signed Purchase Order, PO NDS2219201, for the 10,000 08AER Chips at $387.00 per chip, for a total of $3,870,000.00." (Doc. 1 at ¶ 29). And on July 18, 2022, Defendant "sent a Sales Order, SO-80569, to Mr. Lawley via email referencing PACCAR's Purchase Order NDS2219201, for the order of 10,000 Chips at $387.00 per Chip, for a total of $3,870,000.00." (*Id.* at ¶ 30). Both orders expressly identified the chips to be provided with part number MCIMX6D4AVT08AER. (*See id.* at ¶¶ 29–30). Plaintiff claims that Defendant has been unjustly enriched at Plaintiff's expense by selling a product that was not as promised in the orders, and that Plaintiff detrimentally relied on false promises made by Defendant. (*See id.* at ¶¶ 134–137, 139–142, 144–152).

In its Motion to Dismiss, Defendant attached a document as an exhibit that Defendant purports to be "Terms and Conditions" alluded to in its Sales Order that was incorporated into the underlying sales agreement. (Doc. 21 at ¶ 5). And Defendant emphasizes that this document contains an exculpatory clause that protects it from liability on all claims and, alternatively, a damages limitation

clause that precludes any claims for damages exceeding the purchase price or claims for indirect, special, incidental, consequential, or punitive damages. (*Id.* at 18–19).

But Plaintiff alleges that, to its knowledge, no separate terms of sale were ever provided to it by Defendant. (Doc. 1 at ¶ 31). Plaintiff alleges that its Assistant Director of Purchasing, Jay Lawley, "did not observe any reference to separate terms or conditions of sale in Sales Order SO-80569, nor was it his experience that any other chip brokers would include terms of sale with PACCAR's orders." (*See id.* at ¶¶ 18, 32). While Plaintiff admits that it, in the process of litigating a separate lawsuit, learned much later that "the second page of Sales Order SO-80569 contained, in tiny[,] non-distinct print, a reference to a separate DCI webpage that supposedly contained sales terms and conditions," Mr. Lawley did not realize at or about the time of the Sales Order that Defendant "had a separate website with supposed sale terms . . . that he was being directed to." (*See id.* at ¶¶ 33, 35). "To PACCAR's knowledge, at no time did the communications from [Defendant's Sourcing Team Leader] reference the need for PACCAR to go to a separate website for supposed sales terms." (*Id.* at ¶ 36). "[N]o confirmed version of any website terms and conditions ha[s] ever been provided to PACCAR as it would have supposedly existed at the time that Sales Order SO-80569 was issued." (*Id.* at ¶ 34).

Importantly, Plaintiff disputes the authenticity of the "Terms and Conditions" document in its opposition to Defendant's Motion to Dismiss (Doc. 24 at

7–9, 15). "[T]he document entitled Standard Sales Terms & Conditions is not dated and is stated to be Rev. 005." (*Id.* at 7) (internal quotation marks omitted). "Moreover, the document specifically notes that there are different versions of the document, explaining that DCI must 'verify current revision.'" (*Id.*). "DCI has provided no evidence that . . . [the Terms & Conditions were] in place when the sales order was entered." (*Id.*).

The Court therefore will not consider this separate document at this motion to dismiss stage and finds that Plaintiff alleges sufficient facts to state a plausible claim to relief under its unjust enrichment (Count VI) and promissory estoppel (Count VII) claims. Thus, Defendant's Motion to Dismiss Counts VI and VII is denied.

**CONCLUSION**

For the foregoing reasons, it is **ORDERED** that:

1) Defendant's Motion to Dismiss (Doc. 21) is **GRANTED in part and DENIED in part**.
2) The contract claims (Counts I, II, III, and V) (Doc. 1) are **DISMISSED with prejudice**.
3) As to Counts IV, VI, and VII, Defendant's Motion to Dismiss (Doc. 21) is **DENIED.**

**IT IS SO ORDERED** in Tampa, Florida, on September 17, 2026.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE